**HERBERT J. INVESTMENT CORPORATION, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 73-1832.**

United States Court of Appeals, Seventh Circuit.

Argued April 22, 1974.

Decided July 19, 1974.

---

David J. Cannon, U. S. Atty., Milwaukee, Wis., Scott P. Crampton, Asst. Atty. Gen., William S. Estabrook, III, Atty., Tax Div., Dept. of Justice, Washington, D. C., For defendant-appellant.

James P. Brody, Milwaukee, Wis., for plaintiff-appellee.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and SPRECHER, Circuit Judge.

PER CURIAM.

Taxpayer Herbert J. Investment Corporation brought this action against the United States to recover an income tax refund for the year 1968 in the amount of $402,360.02, plus interest. The distict court granted taxpayer's motion for summary judgment for reasons stated in an earlier decision and order, 360 F. Supp. 825, denying the Government's summary judgment motion. Defendant has appealed and we affirm.

The sole question upon appeal concerns the correct date for determining the fair market value of certain stock received by taxpayer as part of the consideration for the sale of taxpayer's business. See Int.Rev.Code of 1954, § 1001(b).[1]

The facts are fully set forth in the district court's opinion, *supra*. They were for the most part stipulated and are not contested here. We shall recite only such facts as are necessary to accurately frame the issue.

Taxpayer was formerly known as Olson Transportation Company (Olson) and was an interstate trucking common carrier subject to the jurisdiction of the Interstate Commerce Commission (ICC). On February 26, 1968, Olson and another trucking carrier, CW Transport, Inc. (CW), executed an agreement providing for the sale of practically all of Olson's assets to CW. The proposed sale required ICC approval. 49 U.S.C. § 5. For compelling business reasons, Olson and CW agreed to seek permission from the ICC for CW to assume temporary control of Olson pending final approval of the sale by the ICC. See 49 U.S.C. § 310a(b). Temporary authority was granted on March 26, 1968, and management control was assumed by CW on April 1, 1968. Final approval of the sale was granted by the ICC on August 30, 1968, and on that same date title was transferred and the purchase price was paid.

---

1. "§ 1001. Determination of amount of and recognition of gain or loss

   (b) Amount realized.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * * "

In a number of significant respects, the terms of the sale were linked to the temporary control date. Coincident with its takeover on April 1, CW replaced all Olson officers and all but one Olson director with officers and directors named by CW. Olson's tangible assets were sold for a cash price based largely upon net book values as of April 1. Interest on the cash portion of the purchase price was to accrue from the temporary takeover date until final consummation of the sale. Similarly, profits and losses occurring after April 1 accrued solely to CW. Based upon their own experience and the advice of competent counsel, the parties were convinced that final approval by the ICC would follow as a matter of course once temporary authority was granted.

Pursuant to the agreement, Olson's intangible assets were sold for 100,000 shares of CW common stock. CW applied for and received authorization from the ICC to issue such stock . See 49 U.S.C. § 314. The 100,000 shares were conveyed to Olson, along with the balance of the purchase price, on August 30.

The present dispute stems from the fact that the value of CW common stock nearly doubled between April 1, 1968, the date CW assumed temporary control, and August 30, 1968, the date Olson actually received the purchase price, including the stock. The district court considered it "apparent that the [April 1] transfer was considered permanent by those within the industry," and found that the marked increase in value "was probably attributable to CW's assumption of the plaintiff's operations." [2]

In its 1968 federal income tax return, taxpayer valued the 100,000 shares of CW stock at their market value on April 1, 1968. The Internal Revenue Service disagreed and, in a 30-day deficiency letter, valued the CW shares at their substantially higher value as of August 30, 1968. Taxpayer paid the proposed deficiency, with interest, in the amount of $402,360.02. Upon the subsequent disallowance of its timely claim for refund, taxpayer brought the instant action in district court.

Upon consideration of the record in this case, as well as the briefs and oral argument, we agree with the district court that the taxpayer's choice of valuation dates was the correct one. Since we also are in substantial agreement with the reasoning thereof, we adopt Judge Gordon's excellent opinion as our own and upon that authority affirm the judgment below.

Affirmed.

2. These findings apparently were derived from the uncontested affidavit of James F. Heyrman, Executive Vice President of Olson, which states, in pertinent part:

"There were no factors of significance which could be responsible for the substantial increase in the market value of the stock during such period other than the public announcements of the Agreement to sell the Company assets to CW and the grant to CW of temporary control of the Company through management Such announcements had a material effect on the market for CW stock because persons knowledgeable in the trucking industry understood that the grant of temporary authority was tantamount to final approval and knew that the savings to CW through elimination and combination of the duplicate facilities of the Company and CW over the Green Bay-Chicago route would be in the neighborhood of $1,000,000 per year (the pro-forma earnings statement submitted to the ICC disclosed annual savings of $1,000,013)."